IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**AIR-SEA SYSTEMS, LLC**,
    Plaintiff,

v.                                             Civil No. 21-1581 (BJM)

**GRAZEL FOUNDATION, LLC**,
    Defendant.

## OPINION IN A NON-JURY TRIAL

Air-Sea Systems, LLC ("Air-Sea") brought this action under the court's diversity jurisdiction against Grazel Foundation, LLC ("Grazel"), seeking damages for alleged breach of contract involving construction of a maritime platform at Magueyes Island in Lajas, Puerto Rico. Docket No. ("Dkt.") 1. Air-Sea also brought a claim of defamation, alleging that Grazel made false and disparaging statements to the National Oceanic and Atmospheric Administration ("NOAA") and to representatives at the University of Puerto Rico and Puerto Rico Department of Natural Resources. *Id*. Grazel denied the claims and counterclaimed, alleging breach of contract based on Air-Sea's failure to pay amounts owed to Grazel for constructing the platform. Dkt. 10. A two-day nonjury trial was held on October 28 and 30, 2024. The parties submitted post-trial briefs. Dkts. 82, 84. The case is before me with the consent of the parties. Dkt. 50.

Pursuant to Federal Rule of Civil Procedure 52(a), the court issues the findings of fact and conclusions of law set forth below, the result of which neither Air-Sea nor Grazel prevail on their respective claims. Judgment will be entered accordingly.

## FINDINGS OF FACT

1. Air-Sea is a limited liability company with offices in Tallahassee, Florida. Air-Sea's President is Mr. Jim Navarro. Mr. Navarro holds degrees in physics and meteorology. Air-Sea has experience serving as a contractor for NOAA.

2. Grazel is a Puerto Rico-based contractor specializing in heavy foundation work. Grazel is owned and operated by members of the Dieguez family, including Jose Javier Dieguez, his brother Juan Carlos Dieguez, and their sister Jessica Dieguez. Jose Javier Dieguez holds a civil

engineering degree from Polytechnic University of Puerto Rico. Grazel has worked on marinas and piers involving extensive piledriving and has also worked on projects for the U.S. government.

3. NOAA contracted with Air-Sea to build a marine platform off the shore of Magueyes Island in La Parguera, Lajas, Puerto Rico. The platform was intended to house weather monitoring equipment. Per NOAA's requirements, the platform had to be able to withstand the lateral and axial loads of a category four hurricane. The square platform was to be supported by four pilings, one on each corner, driven into the sea floor.

4. Air-Sea commissioned Suelos, PSC to conduct measurements of the seabed where the platform was to be built and to prepare a geotechnical report recommending specifications for the pilings based on NOAA's requirements.

5. Ivan Jackson, a civil engineer at Suelos, PSC, oversaw the measurements and prepared the geotechnical report. Plaintiff's Exhibit ("PX") 1 (the "Suelos Report"). Mr. Jackson's team drilled a test hole at the site using a 140-pound hammer to drive a 2.5-inch diameter casing into the seabed. *Id*. at 17. A cross-sectional sample of the soil was obtained. *Id*. at 3. As Mr. Jackson explained at trial, soil stiffness was determined by counting the number of strikes per foot required to drive the casing into the ground. Stiffer soil allows a piling to withstand greater lateral and axial loads at the same embedment.

6. The Suelos Report found that the first five feet below the mudline consisted of soft silt with low soil stiffness. PX 1 at 3. Abundant coral fragments were found below five feet, which greatly increased driving resistance. *Id*. The sample could not be driven deeper than ten feet below the mudline – in other words, the sampling equipment hit "refusal." *Id*. The depth of the sea from the waterline to the mudline was eight feet. *Id*.

7. Based on the results of the test and NOAA specifications for lateral and axial loads, Mr. Jackson recommended eight-inch pilings embedded fifteen feet below the mudline. PX 1 at 4. In making this recommendation, Mr. Jackson noted that "[h]ard driving is expected between 10 and 15 feet deep below [the] mud line due to the presence of abundant coral fragments." *Id*.

Air-Sea Systems, LLC v. Grazel Foundation, LLC, Civil No. 21-1581 (BJM)                                      3

While his own surveying equipment was only capable of reaching a depth of ten feet, Mr. Jackson assumed that the equipment used to drive the pilings would be larger and more powerful, and thus capable of reaching a greater depth.

8. The Suelos Report concluded with a disclaimer that "inspection and supervision of pile driving is, in general, a very delicate and specialized matter" and that "there are cases where the lack of proper construction techniques and the lack of adequate supervision have given rise to the occurrence of foundation problems and failure." PX 1 at 5.

9. After accounting for the embedment of the pilings, the depth of the water, and the distance between the waterline and the platform, the pilings needed to measure twenty-five feet to the base of the platform.

10. Air-Sea contracted with CMA Architects & Engineers, LLC ("CMA") to design the structure and prepare architectural drawings for the project. PX 2. The CMA drawings show where the pilings were to be installed in relation to the existing pier. With respect to the required depth of the pilings, the drawings indicate "length and embedment as per geotechnical recommendations." *Id*. at 1. The drawings also indicate that two of the pilings (labelled "A" and "B") were to extend an additional 7 feet, 2 ½ inches above the deck of the platform. *Id*. at 3. Accounting for the extra height above the platform and expected embedment of fifteen feet below the mudline, the "A" and "B" pilings were expected to measure 32 feet, 2 ½ inches in total.

11. The CMA drawings also include a survey of the existing structures on the site, along with notes about which structures would be demolished. An existing wooden structure with footprint overlapping that of the new platform was to be demolished. The wooden structure was supported by concrete pilings driven into the sea floor. Based on the CMA drawings, these pilings were close to, but slightly inside, the planned location of the pilings for the new platform. PX 2 at 1.

12. In January 2021, Air-Sea entered into a construction contract with Grazel to install the pilings and secure the platform to the pilings. Joint Exhibit ("JX") 1.

13. The construction contract specified three items for which Air-Sea would pay Grazel. First, Air-Sea agreed to pay Grazel $45,000 for mobilization and insurance. Second, Air-Sea agreed to pay Grazel $14,400 for materials – $90 per linear foot for 160 linear feet of pilings. Third, Air-Sea agreed to pay Grazel $48,000 to install the pilings ($300 per linear foot). The total amount that Air-Sea agreed to pay Grazel was $107,400. JX 1 at 1.

14. The construction contract specified that "[m]aterials & movilization [sic] must be paid up front." JX 1 at 1. Based on the quotes for each line item, Air-Sea agreed to pay Grazel a total of $59,400 ($45,000 for mobilization, $14,400 for materials) upfront. However, the contract did not provide a targeted start date for construction.

15. The contract further specified that "there is no deductible for piles that encounter[] refusal before 40 ft. Instalation [sic] price must be paid full length." JX 1 at 1. The contract also noted that the pilings "come[] with coal tar epoxy treatment." *Id*.

16. The contract required Air-Sea to pay Grazel within 30 days of receiving "monthly certifications." JX 1 at 2. At trial, it was established that these functioned in an identical manner to invoices.

17. The contract also contained a section titled "exclusions." This section specified that pile layout, surveying, engineering services, and geotechnical services were excluded from the contract. Further, this section noted that "[u]tilites removal or relocation, obstruction should be romoved [sic] by contractor if not standup rate will apply." JX 1 at 3.

18. Grazel invoiced, and Air-Sea paid, a total of $40,000 prior to commencing construction.

19. On July 20, 2024, in anticipation of construction, Jose Dieguez visited the site at Magueyes Island. He observed that the existing wooden platform still needed to be demolished. Mr. Dieguez informed Mr. Navarro, who agreed to arrange demolition. Several days later, Mr. Navarro sent Mr. Dieguez pictures of the site showing that the wooden platform had been demolished.

20. Between July 31 and August 3, Grazel mobilized their equipment and materials. Grazel rented a barge and crane from Commercial Divers, a subcontractor. The platform itself was provided to Grazel by Air-Sea.

21. On August 4, Grazel started to install the pilings. Neither Mr. Dieguez nor Mr. Navarro were present at the construction site that day.

22. Before driving the pilings, Grazel's crew noticed that the concrete pilings from the older wooden structure were still on the sea floor, in the way of where the new pilings were to be installed. Grazel informed Mr. Navarro and Grazel agreed to remove the pilings. Air-Sea agreed to pay for their removal, though no price was specified for this work.

23. Grazel and Commercial Divers coordinated to remove the pilings from the bottom of the sea floor. However, the portion of the old pilings embedded beneath the mudline had not been removed. This portion obstructed where Grazel sought to install the new pilings. At trial, it was undisputed that removal of the portion of the old pilings beneath the mudline was not feasible.

24. To avoid the obstruction from the old pilings, Grazel proposed to install the new pilings closer to the existing pier than the plans indicated. Regarding this matter, Mr. Dieguez spoke with Mr. Navarro over the phone.

25. Present at the site on August 4 was an Air-Sea employee named Todd (no last name provided). Apart from the fact that he was an Air-Sea employee, no evidence was presented about Todd's position at Air-Sea or his role at the site that day. Todd informed Grazel's crew that installing the new pilings slightly closer to the existing pier would be ok with Air-Sea, so long as they were as close as possible to the existing pilings.[1]

26. Grazel began driving the pilings into the seabed as close as possible to the existing pilings. They hit refusal that same day (August 4) after driving the pilings approximately eight feet, on average, beneath the mudline.

---

[1] At trial, Air-Sea objected to the admission of Todd's statement based on hearsay. However, the objection was overruled since his statement was an admission of a party opponent – it was undisputed that Todd was an employee of Air-Sea and was at the site on August 4. *See* Fed. R. Evid. 801(d)(2)(C).

27. On August 5, Mr. Dieguez reported to Mr. Navarro that the pilings had hit refusal. Mr. Dieguez visited the site that day and observed that the tops of the pilings were deformed from repeated hammer strikes.

28. Ivan Jackson at Suelos was notified by CMA over email that the pilings hit refusal at eight feet. He was surprised, having expected the contractor to hit refusal at a greater depth. Since the pilings were not embedded as deep as planned, he recommended installing additional pilings around the perimeter of the platform to provide extra lateral support.

29. The construction contract quoted for 40-foot long pilings, but the pilings Grazel installed were only 20 feet long. Since the piling material was sold in 20-foot increments, and since the total anticipated length of the pilings was longer than this, Grazel had procured eight piling sections of 20 feet, and planned to weld ("splice") two 20-foot pilings together. The resulting piling would then be cut down to the required length. However, since the pilings were only embedded eight feet beneath the mudline, the 20-foot pilings reached the level of the deck without needing multiple sections to be spliced together – eight feet beneath the mudline, plus eight feet from the mudline to the water surface, plus two feet from the water surface to the platform deck totaled eighteen feet. After installing four 20-foot pilings, four additional 20-foot piling sections were left over. The leftovers were purportedly stored at the Commercial Divers yard in Ponce, Puerto Rico.

30. The 20-foot pilings were not tall enough to comply with the specifications for the "A" and "B" pilings, which were supposed to extend 7 feet, 2 ½ inches above the platform deck. Grazel did not splice an additional section on top of these pilings to reach their specified height. The tops of the pilings were also reportedly left in a rough and hazardous condition.

31. The pilings were not installed exactly where the CMA drawings indicated. Mr. Navarro visited the site after Grazel had left and observed that the pilings were off the mark by around one foot each. Since the pilings were installed using the platform itself as a template, the location of each piling was off by the same amount, and this did not affect securing the platform to the pilings.

32. Grazel also neglected to drill the holes in the pilings used to fasten the platform to the pilings.

33. After August 5, Grazel attempted to reach an agreement with Air-Sea to perform remedial work. This would include installing additional pilings around the platform perimeter as Ivan Jackson recommended, cleaning up the tops of the pilings and, with respect to the "A" and "B" pilings, installing additional sections to increase their total length. Grazel also offered to assist with installing equipment from NOAA on the platform. Grazel offered to perform this work in exchange for receiving the unpaid balance of the contract, $48,000. However, despite several weeks of back-and-forth communication, no agreement on the remedial work was reached. *See* Defendant's Exhibit ("DX") B.

34. Meanwhile, Grazel sought to be paid the balance of the upfront expenses for materials and mobilization. After leaving the construction site on August 4, Grazel sent Air-Sea an invoice for $19,400. Air-Sea did not immediately pay, and Grazel followed-up repeatedly with Mr. Navarro. Grazel informed NOAA that Air-Sea had refused to pay the balance of the contract and that Air-Sea had threatened Grazel with fines to perform additional work outside of the contract. PX 10 at 1. On August 31, NOAA wrote to Mr. Navarro informing him of Grazel's complaint, requesting access to Air-Sea's records, and requesting proof that Grazel was paid all amounts due. PX 10 at 1-2.

35. Air-Sea responded to NOAA, addressing their concerns by pointing out that their agreement with Grazel gave them thirty days to pay invoices after receipt. Since the $19,400 invoice was received after Grazel left the site on August 4, Air-Sea was not late on any payments at the time.

36. On September 2, Air-Sea paid Grazel $19,385.[2] DX B at 16. No subsequent payments were made by Air-Sea to Grazel.

37. Failing to come to an agreement with Grazel regarding the remedial work, Air-Sea attempted to perform some of the work on its own. These efforts being unsuccessful, after several weeks

---

[2] The parties provided no explanation for the $15 discrepancy between Grazel's invoice amount and the amount Grazel received.

they found another contractor who could make the repairs for around $30,000. The new contractor drilled the required holes to fasten the platform to the pilings, cleaned up the tops of the pilings, and welded additional sections on top of the "A" and "B" pilings.

38. After this, NOAA instructed Air-Sea to leave the platform as-is, without installing any additional pilings. Air-Sea ultimately turned the platform over to NOAA later than they had originally agreed to. Air-Sea did not claim to have received less than their contracted amount from NOAA after turning over the platform.

39. Grazel purportedly never paid Commercial Divers under their subcontract. Commercial Divers sought payment directly from Air-Sea, but Air-Sea did not pay, claiming this was Grazel's responsibility. Commercial Divers now requires Grazel to pay upfront when subcontracting on construction projects.

## DISCUSSION

Air-Sea claims that Grazel failed to perform the construction job in the manner agreed to in their contract. They base their claim on several deficiencies: 1) the pilings were driven eight feet below the mudline, though the geotechnical recommendations specified fifteen feet; 2) the pilings were not installed in the exact location indicated in the CMA drawings; 3) the pilings were not painted with coal tar epoxy treatment as specified in the contract; 4) the pilings labelled "A" and "B" in the drawings did not extend 7 feet, 2 ½ inches above the platform; 5) the tops of the pilings were left in a rough, hazardous condition; and 6) the holes for bolts fastening the platform to the pilings were not drilled. Dkt. 82 at 5-6. Air-Sea claims that they were forced to pay out of pocket to fix these deficiencies, including costs to hire another contractor, additional materials, and living expenses while in Puerto Rico overseeing the repairs. Dkt. 82 at 7. Air-Sea also brings a defamation claim against Grazel, asserting that Grazel defamed Air-Sea's reputation by telling NOAA, the University of Puerto Rico, and the Puerto Rico Department of Natural Resources that Air-Sea had not paid Grazel the money they were owed for the project. Dkt. 82 at 8.

Grazel's breach of contract counterclaim asserts that Air-Sea failed to pay the full required amount under their contract, $107,400. Air-Sea paid Grazel a total of $59,385, leaving $48,015

unpaid. Dkt. 84 at 5. In addition to seeking the unpaid balance of the contract amount (plus interest), Grazel alleges that Air-Sea's failure to pay timely and in full meant they were unable to pay their subcontractor Commercial Divers for the barge and crane rental. Grazel claims reputational damage, noting that Commercial Divers now requires upfront payment from Grazel when contracting for projects. Dkt. 84 at 11-12. Grazel also alleges $100,000 worth of damages for equipment and machinery held at the Commercial Divers yard for over two years. Dkt. 84 at 12.

### A. Air-Sea's Breach of Contract Claim

As this is a diversity action, Puerto Rico choice-of-law rules apply. *Allstate Ins. Co. v. Occidental Int'l, Inc.*, 140 F.3d 1, 3 (1st Cir. 1998). Absent a contractual choice-of-law clause, "Puerto Rico adopts the dominant contacts approach to determine the rule of decision in contractual disputes." *La Carpa Corp. v. Am. Spaceframe Fabricators, LLC*, Civil No. 09-2014 (DRD/BJM), 2014 U.S. Dist. LEXIS 201220, 2014 WL 12889278, at *12 (D.P.R. Jan. 24, 2014); *see also* Restatement (Second) of Conflict of Laws § 188 (Am. L. Inst. 1971). Under this doctrine, "the laws of the jurisdiction with the most significant contacts with respect to the disputed issue should apply." *A.M. Capen's Co. v. American Trading and Production Corp.*, 74 F.3d 317, 320 (1st Cir. 1996). Here, the contract does not contain a choice-of-law clause, the construction project was in Puerto Rico, the relevant conduct with respect to breach occurred in Puerto Rico, and the contract appears to have been negotiated and executed in Puerto Rico. Therefore, Puerto Rico is the jurisdiction with the most significant contacts and Puerto Rico contract law applies.

"Under Puerto Rico law, a claim for breach of contract has three elements: (1) a valid contract; (2) a breach by one of the parties to the contract; and (3) resulting damages." *R&T Roofing Contr., Corp. v. Fusco Corp.*, 265 F. Supp. 3d 145, 154 (D.P.R. 2017) (citing 31 L.P.R.A. § 3018). "If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed. If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail." 31 L.P.R.A. § 3471. "It is basic law that in a contract case, the plaintiff has the burden of proof to show that

there was a contract and a breach." *Muniz-Olivari v. Stiefel Laboratories, Inc.*, 496 F.3d 29, 38 n.7 (1st Cir. 2007). In this case, neither party disputes the validity of the construction contract between Air-Sea and Grazel executed in January 2021. The question is whether Grazel breached the contract, and if so, what damages resulted from such breach.

Air-Sea bases their breach of contract claim on alleged discrepancies between the architectural plans and Grazel's delivered product. Under Puerto Rico law, when executing a construction contract, "[t]he contractor binds himself not only to perform the work, but also to perform it correctly." *Constructora Bauzá, Inc. v. Garcia López*, 129 D.P.R. 579, 594, 1991 Juris P.R. No. 99 (1991). "This obligation will prevail even in those cases in which there is no express agreement to such effects." *Id*. The construction contract does not reference the Suelos Report or the CMA drawings and contains a clause stipulating that "[n]o other agreements or documents not specifically given to JOHN GRAZEL, INC. [sic; presumably Grazel Foundation, LLC] and referred herein are included in this Proposal/Contract." JX 1 at 3. While this would seem to preclude incorporation of the Suelos Report and CMA drawings into the contract, I find that incorporation of these specifications was the evident intent of the parties. "In order to judge as to the intention of the contracting parties, attention must principally be paid to their acts, contemporaneous and subsequent to the contract." 31 L.P.R.A. § 3472. Each of the construction contract, the Suelos Report, and the CMA drawings refer to the Magueyes Island maritime platform as the subject project. The contract itself contains no construction specifications. At the time of construction and during litigation, the parties proceeded under the assumption that the Suelos Report and CMA drawings contained specifications enforceable under the contract. Therefore, departures from the specifications in the Suelos Report and CMA drawings may be considered deficiencies in the performance of the contract.

Air-Sea points to several alleged deficiencies: 1) the pilings were driven eight feet below the mudline, though the plans specified fifteen feet; 2) the pilings were not installed in the exact location indicated in the CMA drawings; 3) the pilings were not painted with coal tar epoxy treatment as specified in the contract; 4) the pilings labelled "A" and "B" in the drawings did not

Air-Sea Systems, LLC v. Grazel Foundation, LLC, Civil No. 21-1581 (BJM)                                          11

extend 7 feet, 2 ½ inches above the platform; 5) the tops of the pilings were left in a rough, hazardous condition; and 6) the holes to hold the bolts fastening the platform to the pilings were not drilled. I will analyze each claim below.

### i.     Piling Depth

The Suelos Report recommends an embedment depth of fifteen feet below the mudline for each piling. PX 1 at 4. The CMA drawings do not specify an embedment depth and instead refer to the Suelos Report. PX 2 at 1. Neither party disagrees that Grazel's pilings extended no more than eight feet (on average) below the mudline. Thus, it is undisputed that Grazel's pilings did not conform precisely with the construction specifications.

While acknowledging their failure to comply with the fifteen-foot specification, Grazel nonetheless insists that they did not breach the contract. The contract contains a clause stating that "there is no deductible for piles that encounters refusal before 40 ft. Instalation [sic] price must be paid full length." JX 1 at 1. The effect of this clause, according to Grazel, is that they are excused from driving the pilings to fifteen feet if they encounter refusal before that point. I agree with Grazel's interpretation for three reasons. First, the clause is not ambiguous or subject to multiple interpretations. Second, Air-Sea does not attempt to argue in favor of a different interpretation. And third, Grazel's interpretation makes sense based on context. As Ivan Jackson explained in his testimony, exactly when a piling will hit refusal is somewhat uncertain even after the site has been surveyed. Factors such as the size of the piling, the type of equipment used, soil uniformity (or lack thereof), and the precise location of the piling all introduce uncertainty into the process. Per the contract, Grazel was not responsible for site surveying or for determining the appropriate depth of the pilings – these specifications were to be provided to them by Air-Sea. This being the case, it makes sense that the parties shifted the risk of early refusal to Air-Sea, the party responsible for surveying and design.

Air-Sea's response is to contest that Grazel actually hit refusal at eight feet. However, as indicated in the findings of fact, Grazel has proven so by a preponderance of the evidence. True, hitting refusal so early was unexpected. Ivan Jackson testified that he was surprised to hear that

Grazel was not able to drill any deeper since his own lightweight survey equipment reached ten feet. He assumed that the piledriver used for the foundations would be considerably larger, more powerful, and capable of reaching a greater depth. But Mr. Jackson conceded that hitting refusal between five and ten feet was possible. As for positive evidence that refusal was reached, Mr. Dieguez observed the pilings the day after they hit refusal and noticed that the tops of the pilings were deformed from repeated striking. Based on his experience, a piling tends to "bulb" when it hits refusal, as repeated strikes from the hammer fail to drive it deeper into the soil. And the fact that Grazel was apparently willing to install additional pilings to help support the platform, at no extra cost to Air-Sea, suggests that they would have driven the four main pilings deeper if they could have.

To sum up, Grazel failed to drive the pilings to the required depth of fifteen feet beneath the mudline. However, since they hit refusal at eight feet, they are excused under the terms of the contract. Air-Sea cannot claim that Grazel breached the contract based on the depth of the installed pilings.

### ii. *Location of Installed Pilings*

Air-Sea's second claim of breach alleges that Grazel installed the pilings in the wrong location – approximately one foot off from the locations indicated in CMA's drawings. Grazel concedes that the pilings were not installed precisely where the drawings specified. Instead, they claim that driving the pilings in that location would have been impossible due to obstructions. Grazel also claims that they received Air-Sea's permission to deviate from the plans and install the pilings where they did.

Under Puerto Rico law, "[i]n obligations to do, the debtor shall also be released when the prestation appears to be legally or physically impossible." 31 L.P.R.A. § 3193. "[T]he doctrine applies when new circumstances make it impossible to comply with the obligation when it becomes due." *S. Cat, Inc. v. W PR Mgmt, LLC*, Civil No. 19-1377 (FAB), 2022 U.S. Dist. LEXIS 246072, 2022 WL 20814976, at *53 (D.P.R. Jul. 20, 2022). Putting aside the issue of whether the obstructions were a "new circumstance," based on the CMA drawings, Grazel should not have

encountered obstructions when driving the pilings in the planned locations. While the pilings from the old wooden structure were originally left on the sea floor, Mr. Dieguez testified that these were removed before Grazel started work. The portions of the old pilings beneath the mudline were not removed, but these do not appear to be on the same footprint as the new pilings. Per CMA's drawings, the new pilings sit just outside the old ones. *See* PX 2 at 1. Either the CMA drawings did not accurately reflect the site conditions, or Grazel misread the drawings. Having presented no evidence to show the former, Grazel cannot rule out the latter and cannot rely on an impossibility defense.

Grazel's main justification for the locational discrepancy of their pilings is that they received permission from Air-Sea to deviate from the CMA drawings and install the pilings closer to the existing pier. "The obligations outlined in a contract may be modified upon the parties' consent." *La Carpa*, 2014 U.S. Dist. LEXIS 201220 at *13 (citing *Diaz & Morey, Inc. v. Báez*, 87 D.P.R. 479, 488 n.4 (1963)). This consent may be given through an agent if consenting to the modification is within the scope of their authority. *See* 31 L.P.R.A. § 4461 ("A principal must fulfill all the obligations which the agent may have contracted, within the scope of his authority."). An agent's authority can arise either through an express statement by the principal (written or oral) or via implication. *See* 31 L.P.R.A. § 4422 ("An agency may be express or implied. An express agency may be given by a public or private instrument and even by parol."). "[A] principal may be bound by a purported agent's acts, even in the absence of actual authority, when a third party reasonably believes the agency relationship to exist and that reasonable belief can be traced to the principal's manifestations." *Vázquez-Robles v. CommoLoCo, Inc.*, 757 F.3d 1, 6 (1st Cir. 2014); *see also Grajales-Romero v. American Airlines, Inc.*, 194 F.3d 288, 293 & n.2 (1st Cir. 1999) (noting that Puerto Rico law recognizes the doctrine of apparent authority, though courts occasionally use different wording when applying it).

Mr. Dieguez testified that on August 4, he informed Mr. Navarro over the phone that they could not install the pilings in the locations indicated in the CMA drawings since the wooden structure's pilings were in the way. What Mr. Navarro said in reply was not elucidated at trial. Mr.

Dieguez's testimony instead relates that Todd told the Grazel crew that the location would be ok with Air-Sea so long as they were driven as close as possible to the existing pilings. Mr. Navarro insisted that he never gave Todd authorization to approve the location, nor did he ever inform Grazel that Todd was so authorized.

The facts established at trial are insufficient for Grazel to make out their modification of contract defense. There is no indication that Todd ever had actual authority to approve the location of the pilings. If Grazel showed that they reasonably believed Todd had authority based on manifestations made by Air Sea, they could have justified their action based on apparent authority. But this Grazel has failed to do. Mr. Dieguez did not claim that Mr. Navarro ever told him that Todd would approve the location. All he testified to was that he informed Mr. Navarro that the pilings would have to be installed in a different location. None of the actors present at the site on August 4th – Todd or the Grazel employees who spoke with him – were deposed as witnesses or called to testify at trial. Without their testimony, what was reasonable for Grazel to believe about Todd and his authority is a matter of pure speculation. Grazel's failure to install the pilings in the location specified by the CMA drawings thus constitutes an unexcused breach of contract.

    *iii.*    *Painting the Pilings*

Air-Sea also claims that Grazel failed to paint the pilings with a coal tar epoxy treatment. The contract states that "10 [inch] diameter steel piles comes with coal tar epoxy treatment." JX 1 at 1. At trial, Mr. Dieguez claimed that the piling segments purchased from the supplier come with a base epoxy coating. Typically, if additional epoxy is desired, it would be specified in the contract, along with a line item price quote and the desired application thickness in millimeters. According to Mr. Dieguez, several months after the contract was signed, Mr. Navarro provided a list of four or five different types of epoxies approved by NOAA and insisted that the pilings be treated with one of them. Mr. Dieguez replied with a price quote. The parties presented no evidence that they reached a final agreement regarding additional epoxy.

Weighing the parties' testimony and considering their obligations as they appear in the contract, Air-Sea has not met its burden to show that Grazel breached with respect to coal tar epoxy

treatment. The contract says the pilings "come[] with coal tar epoxy treatment" – by Mr. Dieguez's unrebutted testimony, this was true of the pilings they installed at the site. Grazel was not obligated under the original contract to apply any additional epoxy to that which came with the piling segments. Additional epoxy is not detailed in the contract nor listed in the bill of materials. And no subsequent agreement obligating Grazel to apply additional epoxy was reached. Therefore, Air-Sea fails to show breach of contract with respect to coal tar epoxy treatment.

      iv.      *Height of the "A" and "B" Pilings*

The CMA drawings indicate that the pilings labelled "A" and "B" were to extend 7 feet, 2 ½ inches above the deck of the platform. PX 2 at 3. At trial, it was uncontested that the "A" and "B" pilings installed by Grazel did not extend above the deck by this amount. Grazel did not dispute that they left the site with four 20-foot piling segments as leftover materials, which shows that they did not extend the "A" and "B" pilings as required. Grazel did not offer any reason why they should be excused for this failure to comply with the plans. This claim is thus effectively conceded to Air-Sea.

      v.      *Rough Condition of the Tops of the Pilings*

Air-Sea alleges that Grazel left the tops of the pilings in rough condition, posing a safety hazard. However, Air-Sea did not present any positive evidence at trial that the pilings were left in rough condition, or that their condition departed substantially from expected industry practice. Thus, they have not met their burden of showing that Grazel's work was deficient in this respect.

      vi.      *Missing Holes for Bolts*

The CMA drawings show that each piling was to be fastened to the platform by eight bolts. *See* PX 2 at 2. Holes to hold these bolts needed to be drilled in the pilings. Air-Sea alleges, and Grazel does not deny, that Grazel did not drill the holes. The contract specifies that Grazel's work obligations include "helping to install the platform on the piles." JX 1 at 1. While Grazel's exact obligations could be clearer, drilling the holes so that the platform could be fastened to the pilings falls under the rubric of "helping to install the platform on the piles." By failing to drill the holes,

the platform could not be secured to the pilings, and Air-Sea had to hire another contractor to perform this work. Therefore, Grazel breached by failing to drill holes in the pilings.

### vii. *Damages*

Having established that Grazel breached the construction contract by installing the pilings in the wrong location, failing to extend the "A" and "B" pilings to 7 feet, 2 ½ inches above the platform, and failing to drill the holes in the pilings, the question turns to Air-Sea's damages. Air-Sea claims that they spent around $30,000 to hire another company to fix Grazel's deficient work. Dkt. 82 at 7. They also claim $20,935.40 in extra travel and per diem expenses, as well as $35,809.41 in office, salary, and materials expenses. Dkt. 82 at 7.

"The losses and damages for which a debtor in good faith is liable, are those foreseen or which may have been foreseen, at the time of constituting the obligation, and which may be a necessary consequence of its nonfulfillment." 31 L.P.R.A. § 3024. Although Puerto Rico contract law is sparse on this point, "[t]he usual remedy for a breach of contract is expectancy damages. That is, courts remedy the breach by putting the non-breaching party in as good of a position as it would be had the breaching party performed." *García-Navarro v. Hogar La Bella Unión, Inc.*, No. 3:17-cv-01271-JAW, 2020 U.S. Dist. LEXIS 224117, at *63-64 (D.P.R. Nov. 30, 2020); *see also* Restatement (Second) of Contracts § 347 (Am. L. Inst. 1971) ("Subject to the limitations stated in §§ 350-53, the injured party has a right to damages based on his expectation interest as measured by (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that he has avoided by not having to perform."). "Although a plaintiff need not prove the amount of its damages with mathematical certainty, its calculation must rest on a reasonable basis and not on mere speculation or guess." *Lincoln Rd. Prods. v. Reign Entm't Group*, Civil No. 12-1895, 2014 U.S. Dist. LEXIS 203374, at *12 (D.P.R. Sept. 8, 2014). "The plaintiff has the burden of placing evidence in the record affording reasonable support for the sums found." *Kolb v. Goldring, Inc.*, 694 F.2d 869, 873 (1st Cir. 1982).

I find that the $30,000 Air-Sea spent hiring another contractor to perform remedial work is, in principle, recoverable on their breach of contract claim. Air-Sea presented testimonial evidence from Mr. Navarro that this expense was incurred, which Grazel did not dispute. Since the expense was paid to fix Grazel's contractually deficient work, it was a foreseeable consequence of Grazel's breach. Grazel also did not attempt to argue that the amount paid was excessive. However, I find that Air-Sea's other claimed expenses, the $20,935.40 in travel and per diem expenses and the $35,809.41 in office, salary, and materials expenses, are not supported by sufficient evidence. With respect to these amounts, Air-Sea provides total sums without any breakdown or calculation methodology. These were their own out-of-pocket expenses – Air-Sea could and should have been able to provide greater detail. And without a more detailed breakdown or calculation methodology, it is impossible to determine whether and to what extent these expenses are traceable to Grazel's breach. For example, Air-Sea's salary expenses may not be compensable if these would have been paid regardless of whether their staff was overseeing remedial work in Puerto Rico. Given the paucity of detail, Air-Sea has not met its burden of showing that their travel, per diem, office, salary, and materials expenses are recoverable on their breach of contract claim.

Further, the fact that Air-Sea avoided having to pay Grazel $48,000 under the contract must be accounted for when determining their damages. Since damages seek to put the non-breaching party in the position they would have been if the contract had been performed properly, expenses they avoided as a result of the breach must be deducted. Restatement (Second) of Contracts § 347 (Am. L. Inst. 1971) (the "cost or other loss that [the non-breaching party] has avoided by not having to perform" is deducted from expectation damages). As a consequence of Grazel's breach, Air-Sea received a deficient product, but also avoided paying $48,000 under the contract. Air-Sea's proven remedial expenses, $30,000, are less than their avoided expenses of $48,000.[3] And Air-Sea did not claim to have received any less compensation from NOAA because of the

---

[3] This is the case even if Air-Sea ought to be compensated $7,200 for purchased but unused materials (80 linear feet of pilings at $90 per linear foot).

platform's non-remediable deficiencies. Given the evidence presented, Air-Sea fails to demonstrate that they suffered any net damages as a result of Grazel's breach of contract.

To summarize, while Air-Sea has shown that they paid $30,000 to fix deficiencies in the work performed by Grazel, they failed to provide enough detail to support their travel, per diem, office, salary, and materials expenses. After accounting for the fact that they avoided paying Grazel $48,000 under the contract, they fail to show that they are entitled to any damages on their breach of contract claim. Thus, no damages will be awarded.

### B. Air-Sea's Defamation Claim

In addition to alleging breach of contract, Air-Sea brings a defamation claim against Grazel. "In order for a private figure . . . to prove defamation under Puerto Rico law, whether it be libel (written) or slander (oral), she must prove the following: (1) that the alleged defamatory statements are false; (2) that the defamatory statements (written or spoken) were negligently made to another; and (3) that the plaintiff suffered damages." *Ojeda-Rodriguez v. Zayas*, 666 F. Supp. 2d 240, 254-55 (D.P.R. 2009) (citing *Torres Silva v. El Mundo, Inc.*, 106 D.P.R. 415, 6 P.R. Offic. Trans. 581 (1977)). According to Air-Sea, Grazel defamed their reputation by telling NOAA, representatives of the University of Puerto Rico, and representatives of the Puerto Rico Department of Natural Resources that Air-Sea had failed to pay what they owed under the contract for work performed. Air-Sea claims Grazel's statements were false since no payments were overdue at the time. Air-Sea alleges that the value of their defamation injury is $500,000. Dkt. 82 at 8.

Air-Sea's defamation claims are not supported by evidence. To start, they have presented no proof that Grazel made any statements to representatives of the University of Puerto Rico or the Puerto Rico Department of Natural Resources. *See Extreme LLC v. Extreme Elecs. Corp.*, Civil No. 17-1347 (DRD), 2017 U.S. Dist. LEXIS 113317, 2017 WL 3098092, at *10 (Jul. 20, 2017) (dismissing plaintiff's defamation claim since the "[plaintiff] presented no proof, such as letters which [d]efendants might have sent to [the plaintiff's] clients or provided phone records, which can attest to their allegations that [d]efendants contacted [the plaintiff's] clients and insulted [the plaintiff]."). While Air-Sea did provide evidence of statements made to NOAA, they have not

shown that they suffered any damages from these statements. In his trial testimony, Mr. Navarro implied that Air-Sea had told NOAA that they were not in fact in arrears on payment to Grazel since less than thirty days had passed from receiving the invoice for $19,400. The first invoice, for $40,000, was paid in a timely fashion. And Air-Sea ultimately did pay Grazel the second invoice within thirty days of receiving it (though apparently shortchanging Grazel by $15). No evidence was presented that NOAA was unsatisfied with this answer or that Grazel's statements otherwise affected Air-Sea's ongoing relationship with NOAA. Their estimated damages figure of $500,000, nearly five times the total value of the contract, similarly lacks substantiating evidence. Accordingly, the court finds that Grazel is not liable to Air-Sea for defamation.

### C. Grazel's Breach of Contract Counterclaim

In addition to refuting Air-Sea's breach of contract and defamation claims, Grazel alleges that Air-Sea is liable for failing to pay the full amount of the contract. Grazel claims that they are owed a further $48,015 under the contract, which is the difference between the agreed-upon price ($107,400) and the total that Air-Sea paid to Grazel ($59,385), plus $15,072 in accrued interest. Dkt. 84 at 5. Grazel also claims that Air-Sea's breach crippled their ability to pay Commercial Divers and forced them to leave extra materials in their yard for an additional two years, to the tune of $121,000 in additional damages. Dkt. 84 at 11-12.

"The Puerto Rico Supreme Court has held that construction contracts . . . are contracts of mutual obligation." *P.R. Highway & Transp. Auth. V. Redondo Constr. Corp.*, 820 F.3d 460, 467 (1st Cir. 2016). The "general principle governing mutual contracts – called in Latin *exceptio non adimpleti contractus* – may be raised as a defense against a party who, having breached the contract, demands performance of the same." *Constructora Bauzá*, 129 D.P.R. at 593. "[I]f the work performed is of an inferior quality or defective, it must be assumed that the results foreseen have not been achieved and that the contractor has not fulfilled his obligation." *Id*. at 594 (quoting Miguel A. Del Arco & Manuel Pons, *Derecho de la construcción* 40-41 (Hesperia Ed., 2d ed. 1980)). "[T]hose defects must exceed the measure of imperfection expected in a construction." *Id*. at 595.

As previously shown, Grazel breached their contract with Air-Sea – the pilings were not installed in the correct location, the "A" and "B" pilings did not reach their required heights, and the holes to secure the platform to the pilings were not drilled. These defects were readily apparent to Air-Sea. Rather than accept the defective product, Air-Sea hired another contractor to correct the deficiencies and brought the current suit against Grazel. And at the time of Grazel's performance, Air-Sea had complied with the obligations on their side of the contract, having paid every invoice Grazel had sent them. Since Grazel breached the construction contract, Air-Sea was within their right to deny further payment. Grazel cannot now demand full payment from Air-Sea.

## CONCLUSION

For the foregoing reasons, the court finds that Grazel is not liable to Air-Sea under their breach of contract or defamation claims. The court similarly finds that Air-Sea is not liable to Grazel under their breach of contract counterclaim. Judgment will be entered accordingly.

**IT IS SO ORDERED.**
In San Juan, Puerto Rico, this 10th day of January, 2025.

*S/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge